IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| GLENNEKQUA HAYWARD,<br><br>             Plaintiff,<br><br>    v.<br><br>SALEM CITY BOARD OF EDUCATION,<br>et al.<br><br>             Defendants. | HONORABLE JEROME B. SIMANDLE<br><br>     Civil Action<br>No. 14-5200 (JBS/AMD)<br><br>     **OPINION** |

APPEARANCES:

Robert N. Agre, Esq.
Agre & Jensen
4 Kings Highway East
Haddonfield, NJ 10133
     Attorney for Plaintiff

Deborah B. Rosenthal, Esq.
Gebhardt & Kiefer, PC
1318 Route 31
P.O. Box 4001
Clinton, NJ 08809
     Attorney for Defendants Salem City and John Sieber

**SIMANDLE, Chief Judge:**

**I.   INTRODUCTION**

     Plaintiff Glennekqua Hayward alleges that while she was a student at Salem City High School, she was subjected to an illegal strip search by administrators at her school in September 2013. Plaintiff alleges constitutional violations under 42 U.S.C. § 1983 and the New Jersey State Constitution,

along with several state tort claims. Presently before the Court is a motion for summary judgment by Defendants Salem City and Salem Police Officer John Sieber. For the reasons set forth below, the Court will grant in part and deny in part Defendants' motion.

## II. BACKGROUND[1]

This action arises from an incident that occurred on September 26, 2013, when Plaintiff, Glennekqua Hayward, was a student at Salem High School. (Defendant's Statement of Material Facts ("SMF") Ex. A at ¶ 2.) At the end of the school day, Plaintiff was taken from her last class by the school's security guard to meet with Jonathan Price, the Vice Principal of Salem High School. (Def. SMF Ex. B (Deposition of Glennekqua Hayward ("Hayward Dep.") at 84:4-85:5.) Plaintiff was taken to Mr. Price's office, where he and Salem Police Officer John Sieber[2] and a school employee Alfreda McCoy-Cuff were waiting. (Id. at 86:3-15.) Mr. Price told Plaintiff that someone reported that she had a knife on her, which she denied. (Id. at 86:3-15.)

---

[1] The Court distills this undisputed version of events from the parties' statements of material facts, affidavits, and exhibits, and recounts them in the manner most favorable to Plaintiff, as the party opposing summary judgment.

[2] Plaintiff's Second Amended Complaint incorrectly refers to Mr. Sieber as "John Cyber." Nonetheless, the Court will use Mr. Sieber's spelling of his own name throughout this Opinion and Order.

Officer Sieber worked for the Salem City Police Department from January 1991 through May 2015, and at the time of the incident was assigned as a school resource officer at Salem City High School. (Def. SMF Ex. F (Deposition of John Sieber ("Sieber Dep.") at 5:4; 6:8-23.) As a school resource officer, he was "there to show presence in uniform as a police officer" and to assist the school's security officer and vice principal and search and patrol school grounds. (Id. at 7:22-8:15.) Officer Sieber testified that he had been called to Mr. Price's office on information that Plaintiff had a knife and that there could be a fight at the end of the school day, and that Mr. Price wanted his assistance with the search for the weapon. (Id. at 17:10-21.) Mr. Price was told about the knife by a member of the child study team and considered the information credible. (Def. SMF Ex. G (Deposition of John Price ("Price Dep.") at 19:5-20:17.) Mr. Price testified that he and Officer Sieber had been having a meeting and that he asked the officer "to stay [for the search] for my safety in case I did find a weapon, but I did not ask him to be part of the search process." (Id. at 29:9-30:21.)

After Plaintiff denied having a knife, Mr. Price asked her to put her belongings on his desk. (Hayward Dep. at 86:4-87:1; 98:5-20.) Mr. Price used a metal detector wand over Plaintiff's body from her shoulders to her feet for approximately 6 seconds, which did not beep. (Id.; see also Sieber Dep. at 24:1-25:1.)

3

Plaintiff was then called over to where Ms. Cuff was standing, with her back to the wall of Mr. Price's office. (Hayward Dep. at 87:2-3.) Ms. Cuff asked her to lift up her shirt. (Id. at 87:21-22.) Plaintiff was facing Ms. Cuff, with her back to Mr. Price, Officer Sieber, and the rest of Mr. Price's office. (Id. at 96:6-24; 163:7-16; see also diagrams at Def. SMF Ex. C & D; Def. SMF Ex. E at ¶ 5; Price Dep. at 46:9-47:9.) Plaintiff lifted up her shirt and the tank top underneath, and Ms. Cuff lifted Plaintiff's bra to feel underneath and behind it. (Hayward Dep. at 98:21-99:24.) Plaintiff's breasts and nipples were exposed and Ms. Cuff's hand touched the lower part of her breast. (Id. at 104:5-25; 106:9-12.) Ms. Cuff then searched the bun on top of Plaintiff's head. (Id. at 107:7-12.) Plaintiff testified that Ms. Cuff instructed her how and where to move her clothing but that no one else said anything during the search. (Id. at 105:16-25; 111:8-9; Price Dep. at 48:22-25.) Ms. Cuff testified that the Mr. Price's office was small enough that everyone there was "in a position to hear what was going on" and that she did not change the tone of her voice. (Def. SMF Ex. I (Deposition of Alfreda McCoy-Cuff ("Cuff Dep.") at 53:24-54:9.) She further testified that she did not have special training in searching students for contraband. (Id. at 12:16-23.) Plaintiff estimates that the physical search lasted for 40-45 seconds. (Hayward Dep. at 107:1-2.)

While Ms. Cuff conducted the physical search, Mr. Price looked through Plaintiff's backpack and jacket on the floor. (Id. at 87:4-17; 111:15-23.) Mr. Price did not "specifically" instruct Ms. Cuff about how to search Plaintiff's body and saw only the beginning of the physical search, while Ms. Cuff was patting down Plaintiff's belt line over her clothing. (Price Dep. at 47:10-48:21.) Office Sieber was seated in a chair furthest from the door and never moved. (Hayward Dep. at 160:13-171:17; see also Sieber Dep. at 24:7-26:13.) He watched Mr. Price search Plaintiff's backpack. (Sieber Dep. at 26:9-18.) He did not observe or participate in Ms. Cuff's physical search and testifies that he did not hear Ms. Cuff ask Plaintiff to lift up her shirt or her bra. (Id. at 27:4-9; 46:21-25.) No weapons were found in Plaintiff's backpack or on her person. (Id. at 33:17-34:17.)

After the physical search concluded, Plaintiff sat down in a chair next to Officer Sieber. (Hayward Dep. at 107: 14-18.) Officer Sieber asked Plaintiff to remove her shoes. (Id. at 107:19-10; see also Def. SMF Ex. E at ¶ 4.) Officer Sieber picked up and shook out Plaintiff's shoes but did not touch her. (Id.; see also Def. SMF Ex. E at ¶¶ 1-3.) Officer Sieber denies asking Plaintiff to remove her shoes, and Mr. Price recalls that it was Ms. Cuff who instructed Plaintiff to remove her shoes. (Sieber Dep. at 345:4-6; Price Dep. at 49:8-50:2.) Plaintiff was

5

then instructed that she could gather her belongings and wait until the school bell rang to leave Mr. Price's office, approximately 10 minutes later. (Hayward Dep. at 115:21-25.)

The following day, the Principal and Superintendent of Salem High School met with Mr. Price regarding Plaintiff's complaints about the strip search, and he was put on administrative leave pending the school district's investigation into the matter and asked to forfeit his keys and school badge. (Price Dep. at 61:11-63:10.) After the incident, Plaintiff stopped attending Salem High School. (Def. SMF Ex. A at ¶ 3.)

Plaintiff claims that she suffers from "emotional distress, humiliation, embarrassment, fear, anxiety, anger and concern" as a result of the incident, and she has stopped attending Salem High School. (Def. SMF Ex A at ¶ 3.) Plaintiff was embarrassed by the search because Defendants knew her "but believed that I had a weapon." (Def. SMF Ex. B at 168:20-169:1.) Plaintiff had an appointment with the school counselor, but told the counselor that she was "fine" because she "didn't want to talk to her" and she doesn't "like telling people about how I feel." (Id. at 144:23-145:15.) She had a regular checkup with her doctor who told her she saw signs of depression but did not prescribe any medication. (Id. at 145:16-146:15.) Plaintiff has not otherwise received any counseling, therapy, or medical attention about the incident. (Id.; see also 178:16-24.) She suffers from no

6

physical symptoms on account of the incident aside from lost sleep. (Id. at 179:12-180:9.)

Plaintiff engaged an expert, Vito A. Gagliardi, Ed.D., who opined that the Board of Education and its agents failed to protect Plaintiff from "foreseeable dangers" and engaged in inappropriate conduct "by violating state laws, regulations and local Board policies and procedures." (Plaintiff's Counterstatement of Material Facts ("CSMF") Ex. A at 3-4.) Dr. Gagliardi concluded that Mr. Price should not have searched Plaintiff based on an anonymous tip communicated to him by a member of the child study team (id. at 9), that school administrators should have contacted Plaintiff's mother prior to searching Plaintiff (id.), that no strip search should have been performed under N.J.S.A. 18A:37-6.1 (id.), that Officer Sieber's presence during the search was inappropriate (id. at 14), and that Officer Sieber "knew, or should have known, that the body/strip search conducted by Ms. McCoy-Cuff was inappropriate and illegal." (Id.)

Plaintiff filed the instant lawsuit on August 20, 2014 and her Second Amended Complaint against Salem City Board of Education, Salem City, Jonathan L. Price, Amiot Patrick Michel, Gregory H. Dunham, John Sieber, Alfreda McCoy-Cuff, and various John Doe Defendants on May 4, 2015, alleging abuse/neglect of a child, invasion of privacy, violations of 42 U.S.C. §§ 1983 &

1988, state created danger, gross negligence, negligence, negligent hiring and/or supervision, intentional infliction of emotional distress, negligent infliction of emotional distress, and civil and criminal conspiracy. [Docket Items 1 & 42.] After exchanging fact and expert discovery, Defendants John Sieber and Salem City filed the instant motion for summary judgment. [Docket Item 57.][3] The motion is now fully briefed and the Court will decide without holding oral argument pursuant to Fed. R. Civ. P. 78.

## III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) generally provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact" such that the movant is "entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A "genuine" dispute of "material" fact exists where a reasonable jury's review of the evidence could result in "a verdict for the non-moving party" or where such fact might otherwise affect the disposition of the litigation. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

---

[3] Defendants Price, Michel, Dunham, McCoy-Cuff, Salem City Board of Education, Salem City School District, and Salem High School separately moved for summary judgment [Docket Items 65 and 66]. Their motions were withdrawn and the Defendants were terminated from this action when the parties settled their disputes. [Docket Items 78 & 80.] Salem City and John Sieber are the only defendants remaining in this case.

Disputes over irrelevant or unnecessary facts, however, fail to preclude the entry of summary judgment. Id.  Conclusory, self-serving submissions cannot alone withstand a motion for summary judgment. Gonzalez v. Sec'y of Dept. of Homeland Sec., 678 F.3d 254, 263 (3d Cir. 2012) (internal citations omitted).

In evaluating a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party, and must provide that party the benefit of all reasonable inferences.  Scott v. Harris, 550 U.S. 372, 378 (2007); Halsey v. Pfeiffer, 750 F.3d 273, 287 (3d Cir. 2014).  However, any such inferences "must flow directly from admissible evidence [,]" because "'an inference based upon [] speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment.'"  Halsey, 750 F.3d at 287 (quoting Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n. 12 (3d Cir. 1990); citing Anderson, 477 U.S. at 255).

## IV. DISCUSSION

### A. Plaintiff's § 1983 Claims

Counts 3 and 4 of the Second Amended Complaint present claims for relief under §§ 1983 & 1988, alleging violations of Plaintiff's constitutional rights under the Fourth and

Fourteenth Amendments of the United States Constitution and

Article One, Paragraph One of the New Jersey State Constitution.[4]

Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. To state a claim for relief under section

1983, a plaintiff must allege: 1) the violation of a right

secured by the Constitution or laws of the United States and 2)

that the alleged deprivation was committed or caused by a person

acting under color of state law. West v. Atkins, 487 U.S. 42, 48

(1988); see also Malleus v. George, 641 F.3d 560, 563 (3d Cir.

2011). State actors may be liable only for their own

_____

[4] Article One, Paragraph One of the New Jersey State Constitution reads: "All persons are by nature free and independent, and having certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness." To the extent that Plaintiff seeks to bring a civil rights claim under the New Jersey Constitution, this Court treats claims under New Jersey's Civil Rights Act analogously to § 1983. See Trafton v. City of Woodbury, 799 F. Supp. 2d 417, 443 (D.N.J. 2011) (analyzing all of plaintiffs' NJCRA claims, including claims of improper search and seizure and false arrest, through the lens of § 1983 because "[t]his district has repeatedly interpreted NJCRA analogously to § 1983."); Major Tours, Inc. v. Colorel, 720 F. Supp. 2d 587, 604 (D.N.J. 2010) (Simandle, J.) (applying one analysis to equal protection claim brought under both § 1983 and the NJCRA because there was no reason to believe analysis would be different).

unconstitutional conduct. Bistrian v. Levi, 696 F.3d 352, 366 (3d Cir. 2012); Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). It is undisputed that Officer Sieber was acting under color of state law during the incident. Accordingly, these claims turn on whether Plaintiff has alleged the violation of a recognized constitutional right and come forward with admissible evidence in support for such claim sufficient to create a genuine dispute of material fact.

### a. Failure to Intervene

In Count 3, Plaintiff alleges that Defendants Price, Cuff, and Sieber violated her rights under the Fourth and Fourteenth Amendment because their conduct "constituted an unlawful search and seizure, conducted without a warrant, without probable cause, without reasonable suspicion and without procedural and substantive due process." (Second Am. Compl. ¶ 5.) The Fourth Amendment protects public school students from unreasonable searches and seizures conducted by school officials. New Jersey v. T.L.O., 469 U.S. 325, 333 (1985). Because it is undisputed that Officer Sieber did not conduct the strip search himself, his Fourth Amendment liability can only arise from failing to intervene to stop Ms. Cuff's physical search. To establish a Fourth Amendment violation for failure to intervene, a plaintiff must prove (1) that the officer had a duty to intervene, (2) that the officer had a reasonable opportunity to intervene, and

(3) that the officer failed to intervene. <u>Smith v. Mensinger</u>, 293 F.3d 641, 650-51 (3d Cir. 2002).

Defendant Sieber contends that he is entitled to summary judgment on this count because the record shows that he had no reasonable opportunity to intervene to stop Ms. Cuff's physical search because he was unaware of what was happening. It is undisputed that Officer Sieber was sitting in a chair across the room from Plaintiff during Ms. Cuff's search, that Plaintiff's back was to Officer Sieber while her breasts were exposed, and that Ms. Cuff's search lasted only around 45 seconds. Officer Sieber testified that he was watching Mr. Price search Plaintiff's backpack during the physical search, and that he did not hear Ms. Cuff direct Plaintiff to lift her shirt or move her bra.

Nonetheless, the Court will deny Defendant's motion for summary judgment as to the failure to intervene claim because the record is not so clear as Officer Sieber suggests. Both Plaintiff and Ms. Cuff testified that Ms. Cuff gave Plaintiff verbal instructions to lift her shirt, and Ms. Cuff testified that she did not change the tone or volume of her voice and that Mr. Price's office was small enough that everyone there was "in a position to hear what was going on." (Hayward Dep. at 105:16-25; 111:8-9; Cuff Dep. at 53:24-54:9.) Mr. Price also testified that his office was "very small," only 10 by 12 feet. (Price

12

Dep. at 77:20-22.) A reasonable view of the facts may demonstrate that Officer Sieber, who was one of four persons in a small office room, was aware of the physical search, despite his contrary assertions. Accordingly, because there is a dispute over an issue of material fact, Defendant Sieber's motion for summary judgment is denied as to Count 3.

### b. State-Created Danger

In Count 4, Plaintiff alleges that Defendants Price, Cuff, and Sieber exposed her to a state-created danger "by taking the affirmative steps of requiring the child, Glennekqua Hayward, to remove her clothing and to expose herself in the presence of Defendants Price, McCoy-Cuff and [Sieber], which rendered the Plaintiff at imminent and foreseeable risk of danger and harm." (Second Am. Compl. ¶ 4.) The Due Process Clause does not impose an affirmative obligation on the state to protect its citizens. Phillips v. County of Allegheny, 515 F.3d 224, 235 (3d. Cir. 2008). The state-created danger theory operates as an exception to that general rule and requires plaintiffs to meet a four part test: "(1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts . . . ; and (4) the state actor affirmatively used his or her authority in a way

13

that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all." Sanford v. Stiles, 456 F.3d 298, 304 (3d Cir. 2006).

The second element of the test requires that the state actor behave in a way that "shocks the conscience," but what is required to shock the conscience is a fact-intensive inquiry, depending in particular upon "the extent to which deliberation is possible" under the circumstances. Id. at 310. In general, "[t]he level of culpability required to shock the conscience increases as the time state actors have to deliberate decreases." Id. at 309. The Third Circuit distinguishes between "hyperpressurized environments" and circumstances where "officials have the time to make 'unhurried judgments,'" requiring an intent to cause harm in the former and deliberate indifference in the latter. Id. "[I]n situations falling in the grey area between requiring 'true split-second decisions' and allowing 'relaxed deliberation,' liability may be found if an official's conduct exhibits a level of gross negligence or arbitrariness that shocks the conscience." Id. (citing Estate of Smith v. Marasco, 318 F.3d 497, 506 (3d Cir. 2006)).

Defendant Sieber contends that he is entitled to summary judgment because the search in Mr. Price's office was a "hyperpressurized environment," lasting only seconds and under threat of finding a weapon on Plaintiff, and Plaintiff has

14

failed to show that he intended to cause Plaintiff harm, because he was unaware of Ms. Cuff's physical search. Plaintiff counters that the record shows instead that the search occurred in Mr. Price's office under circumstances entirely within Defendants' control, that Defendants lacked sufficient information to believe that exigent circumstances existed because the likelihood of finding a knife on Plaintiff's person was low once Mr. Price's metal detector did not ping when he "wanded" Plaintiff, and that Officer Sieber actually may have been aware that an unlawful strip search was occurring, in violation of N.J.S.A. 18A:37-6.1. As above, these factual disputes preclude the entry of summary judgment on Plaintiff's state-created danger claim. Defendants' motion is denied as to Count 4.

### c. **Monell** Liability

Although Defendants do not raise the issue in their briefing, the Court will grant Defendants' motion for summary judgment to the extent that it seeks to hold Salem City liable under § 1983. It is well-established that municipal liability under § 1983 "may not be proven under the respondeat superior doctrine, but must be founded upon evidence that the government unit itself supported a violation of constitutional rights." Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990) (citing Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978)). As a consequence, a municipality is liable under § 1983

for an unconstitutional policy or custom only when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Monell, 436 U .S. at 694; Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986) (plurality opinion) ("[M]unicipal liability under § 1983 attaches where-and only where-a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."). Whether a policy or a custom, "The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown, 520 U.S. 397, 404 (1997). Because Plaintiff has not adduced any evidence that Officer Sieber was acting according to an official policy or custom of Salem City during the search in Mr. Price's office, Defendant Salem City cannot be liable for any constitutional violations committed by Officer Sieber.

### d. Punitive Damages

The Court will also grant Defendant Salem City's motion for summary judgment on Counts 3 and 4 to the extent that Plaintiff seeks punitive damages for violations of her constitutional rights. Municipalities are immune from liability for punitive

16

damages under § 1983. City of Newport v. Fact Concerts, Inc.,
453 U.S. 247, 271 (1981).

The Court will deny summary judgment as to Officer Sieber's
liability for punitive damages, however. Government officials
are immune from liability for punitive damages when they are
sued in their official capacity. Gregory v. Chehi, 843 F.2d 111,
120 (3d Cir. 1988). Government officials are liable for punitive
damages when sued in their individual capacity, however, if a
plaintiff can establish that "the defendants have acted with a
reckless or callous disregard of, or indifference to, the rights
and safety of others." Keenan v. City of Philadelphia, 983 F.2d
459, 470-71 (3d Cir. 1992) (quoting Bennis v. Gable, 823 F.2d
723, 734 (3d Cir. 1987)). As discussed above, the record is not
clear as to Officer Sieber's knowledge of and culpability for
Ms. Cuff's physical search of Plaintiff. Accordingly, the Court
will deny Defendant Sieber's motion to the extent it seeks
summary judgment on Plaintiff's demand for punitive damages
under § 1983.

**B. Plaintiff's Common Law Claims**

The remaining Counts of the Second Amended Complaint seek
relief against all Defendants under New Jersey common law.
Defendants contend that they are entitled to summary judgment
because Defendants are immune from liability under the Tort
Claims Act, because Plaintiff's relief is barred by the Tort

17

Claims Act, and because Plaintiff cannot prove the elements of the tort claims alleged in Counts 1, 2, 5, 6, 7, 8, 9, and 10 of the Second Amended Complaint.  For the reasons that follow, the Court will grant in part and deny in part Defendants' motion for summary judgment on the common law claims.

### a. Tort Claims Act

As a threshold matter, Defendants contend that Plaintiff's case is barred by various provisions of the Tort Claims Act. The New Jersey Tort Claims Act ("TCA"), N.J.S.A. 59:1-1 et seq., governs suits like Plaintiff's which seek relief against public entities and public employees. The TCA provides broad immunity to public entities from tort claims and more limited immunity for public employees, and sets other conditions and limitations on suits and the relief available from public entities and employees.

First, Defendants contend that they are immune from liability under the TCA. Plaintiff failed to respond to this line of argument. The TCA provides that public entities are generally immune for liability from injuries caused by the act or omission of the public entity or its employees. N.J.S.A. 59:2-1. Nonetheless, a public entity may be liable for an injury proximately caused by one of its employees, where that employee is not immune from liability, and where a private employer would be liable under the theory of respondeat superior. N.J.S.A.

59:2-2. The immunities available to public employees, generally, are detailed in N.J.S.A. 59:3-2:

      a. A public employee is not liable for an injury resulting from the exercise of judgment or discretion vested in him;

      b. A public employee is not liable for legislative or judicial action or inaction, or administrative action or inaction of a legislative or judicial nature;

      c. A public employee is not liable for the exercise of discretion in determining whether to seek or whether to provide the resources necessary for the purchase of equipment, the construction or maintenance of facilities, the hiring of personnel and, in general, the provision of adequate governmental services;

      d. A public employee is not liable for the exercise of discretion when, in the face of competing demands, he determines whether and how to utilize or apply existing resources, including those allocated for equipment, facilities and personnel unless a court concludes that the determination of the public employee was palpably unreasonable.

      Nothing in this section shall exonerate a public employee for negligence arising out of his acts or omissions in carrying out his ministerial functions.

A public employee is also immune from liability where "he acts in good faith in the execution or enforcement of any law." N.J.S.A. 59:3-3. However, that immunity is waived where it is established that a public employee's conduct "was outside the scope of his employment or constituted a crime, actual fraud, actual malice or willful misconduct." N.J.S.A. 59:3-14.

      Defendants assume without explanation that Defendant Sieber enjoys immunity (and accordingly, so does Salem City) for his

19

conduct during the search in Mr. Price's office. Defendants are correct that if his conduct is immune, it does not fall into the exception for "a crime, actual fraud, actual malice or willful misconduct." Nonetheless, it is not apparent that Officer Sieber is entitled to immunity for his conduct, and "[i]t is well established that the burden is on the public entity both to plead and prove its immunity under" the TCA. Kolitch v. Lindendahl, 497 A.2d 182, 189 (N.J. 1985). Accordingly, the Court will deny Defendants' motion for summary judgment on the basis of immunity under the TCA.

Next, Defendants argue that even if Defendants Salem City and Officer Sieber are not immune from liability for Officer Sieber's conduct, Plaintiff's relief is barred by the TCA. N.J.S.A. 59:9-2(d), also known as the "verbal threshold," provides that a plaintiff cannot receive damages for pain and suffering against a public entity or a public employee unless she suffers "permanent loss of bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $3,600." However, the verbal threshold does not apply when a public employee's actions constitute willful misconduct; in that instance, a plaintiff may "recover the full measure of damages applicable to a person in the private sector." Toto v. Ensuar, 952 A.2d 463, 464 (N.J. 2008).

20

The record is clear that Plaintiff cannot meet the medical expenses element of the verbal threshold. The record is devoid of any documentation setting forth expenses in excess of $3,600, and Plaintiff herself testified at her deposition that she has not sought medical attention or therapy, other than her regularly-scheduled general physician appointments, since the incident. (Hayward Dep. at 145:16-146:15; 178:16-24.)

Similarly, Plaintiff's injuries do not rise to the level of required by the TCA for recovery for pain and suffering. In order to recover for pain and suffering from a public entity or employee, a plaintiff must show "(1) an objective permanent injury, and (2) a permanent loss of a bodily function that is substantial." Knowles v. Mantua Twp. Soccer Ass'n, 823 A.2d 26, 29 (N.J. 2003) (quoting Gilhooley v. Cnty of Union, 753 A.2d 1137, 1142 (N.J. 2000)). In the present case, Plaintiff does not claim that she suffers from any physical symptoms on account of the incident aside from lost sleep (Hayward Dep. at 179:12-180:9); instead, she seeks compensation in this action for injuries "comprised of emotional distress, humiliation, embarrassment, fear, anxiety, anger and concern." (Def. SMF Ex. A at ¶ 3.) Injuries like Plaintiff's, in the form of "subjective symptoms" such as "depression, stress, health concerns, and anxiety" are considered "pain and suffering" within the meaning

of the TCA. <u>Ayers v. Jackson Twp.</u>, 525 A.2d 287, 296 (N.J. 1987).

Accordingly, Plaintiff cannot meet the verbal threshold of the TCA for recovery of damages against City of Salem and Officer Sieber, unless Plaintiff proves that Officer Sieber acted with actual malice toward Plaintiff or committed willful misconduct. As discussed above, a question of fact exists as to Officer Sieber's level of culpability, if any, for Ms. Cuff's strip search of Plaintiff. Upon the present record of disputed facts, a jury could find that he acted with actual malice or committed willful misconduct by permitting Ms. Cuff's physical search, thereby removing the verbal threshold's bar on recovering damages for pain and suffering. There is no factual dispute that Plaintiff cannot meet the verbal threshold for TCA liability, N.J.S.A. 59:9-2(d); there remains, however, a genuine issue of material fact whether Officer Sieber acted with actual malice or committed willful misconduct upon the tort causes of action that survive against Officer Sieber and the City, as discussed next.

### b. Abuse/Neglect of Child

In the alternative, Defendants contend that summary judgment is warranted as to Counts 1, 2, 5, 6, 7, 8, 9, and 10 of the Second Amended Complaint because Plaintiff cannot, on

this record, prove the required elements of these tort claims. The Court will address each of Plaintiff's counts in turn.

Count 1 of the Second Amended Complaint alleges that Defendants Price, Cuff, and Sieber committed "abuse and/or neglect of the child" when they affirmatively or constructively caused Plaintiff to undress and expose her breasts in Defendants' presence. (Second Am. Compl. Count 1 ¶ 3.) Defendant Sieber contends that summary judgment is warranted because Plaintiff has not stated a claim upon which relief can be granted; Plaintiff offered no response in her briefing.

There is certainly no statutory private cause of action for abuse or neglect of a child; the New Jersey Legislature instead provides for criminal liability for child abuse or neglect (see N.J.S.A. 2C:24-1 et seq.) and Juvenile and Domestic Relations Courts and the Child Protection and Permanency ("CP&P") agency within the Department of Children and Families (see N.J.S.A. Title 9) to protect the welfare and safety of children. Plaintiff has failed to provide evidence that New Jersey courts have implied a civil common law cause of action to vindicate this right. Accordingly, the Court finds that Plaintiff has failed to establish a cognizable claim for relief and will grant Defendants' motion for summary judgment as to Count 1.

### c. Invasion of Privacy

Next, Count 2 alleges that Ms. Cuff's physical search of
Plaintiff constitutes an invasion of privacy, that Plaintiff
"had a reasonable expectation of privacy in not being made to
undress and expose her private area to Defendants," and that
Defendants Price, Cuff, and Sieber's conduct "would be highly
offensive to a reasonable person." (Second Am. Compl. Count 2 ¶¶
2-4.)

The tort of "invasion of privacy" under New Jersey law
encompasses "four distinct kinds of invasion of four different
interests of the plaintiff":

> (1) intrusion (e.g., intrusion on plaintiff's physical
> solitude or seclusion, as by invading his or her home,
> illegally searching, eavesdropping, or prying into
> personal affairs); (2) public disclosure of private
> facts (e.g., making public private information about
> plaintiff); (3) placing plaintiff in a false light in
> the public eye (which need not be defamatory, but must
> be something that would be objectionable to the ordinary
> reasonable person); and (4) appropriation, for the
> defendant's benefit, of the plaintiff's name or
> likeness.

Rumbauskas v. Cantor, 649 A.2d 853, 856 (N.J. 1994) (citing
William L. Prosser, The Law of Torts § 117 (5th ed. 1984)).
Because Plaintiff's claim arises from the search in Mr. Price's
office, Plaintiff's claim is one for intrusion, and to prevail
she must prove "(i) an intentional intrusion (ii) upon the
seclusion of another that is (iii) highly offensive to a
reasonable person." In re Nickelodeon Consumer Privacy Litig.,
___ F.3d ___, 2016 WL 3513782 (3d Cir. 2016) (citing Hennessey v.

24

Coastal Eagle Point Oil Co., 609 A.2d 11, 17 (N.J. 1992)). A
plaintiff must have an objective and reasonable expectation of
privacy in the area searched or intruded on. White v. White, 781
A.2d 85, 91-92 (N.J. Super. 2001). Where there is an intervening
cause of the intrusion into plaintiff's seclusion, a plaintiff
must also prove causation. Leang v. Jersey City Bd. of Educ.,
969 A.2d 1097, 1116-1117 (N.J. 2009).

Defendant Sieber contends that summary judgment is
warranted because Plaintiff cannot show that he intended to
intrude on Plaintiff's privacy. In opposition, Plaintiff merely
rests on allegations in the Second Amended Complaint that allege
the basic elements of an intrusion claim; while this is
appropriate on a motion to dismiss, pointing to allegations in
the Complaint insufficient to withstand a motion for summary
judgment.

Defendant likens this case to Leang v. Jersey City Bd. of
Educ., 969 A.2d 1097 (N.J. 2009), where a teacher alleged that
the principal and another teacher at her school invaded her
privacy when they called in emergency services in response to a
report that she had made threats against students, which
resulted in a strip search and a psychological evaluation at a
nearby hospital. Id. at 1104. According to the teacher, this
report was false, and was made with the intent that the
plaintiff would have to undergo medical evaluation. Id. The

25

Supreme Court ultimately upheld a grant of summary judgment for the principal, finding no evidence that she knew the report was false or intended for the plaintiff to undergo evaluation, and reversed a grant of summary judgment as to the teacher because there was evidence in the record that he knew his report was inaccurate. Id. at 1116. Defendant here latches on to dicta in the case which cautioned that the plaintiff in Leang would have to prove that the defendant "rather than the police or EMTs, was the proximate cause of those two discrete events on which her invasion of privacy claim is based." Id. at 1116-17. According to Defendant, because Ms. Cuff performed the physical search, she is the proximate cause of any invasion of Plaintiff's privacy, and he cannot have intended or caused the invasion.

The extent of Defendant Sieber's active participation in the search of Plaintiff's clothing lies in the fact that, at most, he may have searched Plaintiff's shoes after Ms. Cuff's physical search. (see Hayward Dep. at Hayward Dep. at 107:14-20; Def. SMF Ex. E at ¶¶ 1-3.) No reasonable jury could find that this part of the search constitutes a search "highly offensive to the reasonable person." The inspection of the inside of a pair of shoes, even if performed here as alleged, simply cannot be regarded as "highly offensive to the reasonable person." The Court will grant summary judgment as to Count 2.

### d. Negligence and Gross Negligence

26

Count 5 alleges that all Defendants owed Plaintiff a duty, established by common law, statute, and regulation,

> to provide for the Plaintiff's health, safety, care and general well-being once the Plaintiff came under their custody and supervision; to guard, maintain and protect the Plaintiff once the Plaintiff came under their custody and supervision; to prevent incidents of child abuse and/or neglect insofar as the Plaintiff was concerned; to provide necessary services to the Plaintiff; and to prevent maltreatment, abuse or neglect to the Plaintiff.

(Second Am. Compl. Count 5 ¶ 2.) Plaintiff alleges that Defendants breached that duty, in a manner constituting gross negligence, "when the child, Glennekqua Hayward, was made to undress and expose herself in the presence of Defendants, Price, McCoy-Cuff and [Sieber]." (Id. ¶ 3.) Plaintiff avers that the "supervisory" Defendants "failed to ensure that the individual Defendants were adequately trained and supervised" and "failed to adequately supervise staff that was responsible for ensuring the safety and protection of the Plaintiff." (Id. ¶¶ 4-5.)[5] Count 6 alleges that Defendants owed Plaintiff a duty, established by common law, statute, and regulation, "to exercise reasonable care compatible with the standards of professionalism in the education [sic] and law enforcement" and that Defendants'

---

[5] To the extent Plaintiff brings a claim for negligent hiring or supervision in Count 5, the Court will discuss those issues with respect to Count 7, infra.

conduct in this case violated that duty of care. (Second Am. Compl. Count 6 ¶¶ 2-3.)

In a negligence action under New Jersey law, a plaintiff must establish "(1) that the defendant owed a duty of care; (2) that the defendant breached that duty; (3) actual and proximate causation; and (4) damages." Fernandes v. DAR Development Corp., 119 A.3d 878, 885-86 (N.J. 2015). With regard to claims of gross negligence, "the difference between 'gross' and 'ordinary' negligence is one of degree rather than of quality." Smith v. Kroesen, 9 F. Supp. 3d 439, 443 (D.N.J. 2014) (citing Fernicola v. Pheasant Run at Barnegat, 2010 WL 2794074, at *2 (N.J. App. Div. July 2, 2010)). Gross negligence refers to behavior which constitutes "an indifference to consequences." Banks v. Korman Assocs., 527 A.2d 933, 934 (N.J. App. Div. 1987).

Defendants contend that summary judgment is warranted on Counts 5 and 6 because Plaintiff has failed to show that Salem City and Officer Sieber owed Plaintiff any duty of care, that they breached a duty, or that any damages were caused by Salem City or Officer Sieber. Plaintiff, again, failed to respond to any of Defendants' points in her briefing.

The existence and scope of a duty is a question of law for the court to decide. Robinson v. Vivirito, 86 A.3d 119, 124 (N.J. 2014). It is well established that "school officials have a general duty to exercise reasonable supervisory care for the

28

safety of students entrusted to them, and are accountable for injuries resulting from failure to discharge that duty." Jerkins ex rel. Jerkins v. Anderson, 922 A.2d 1279, 1285 (N.J. 2007) (citing Caltavuturo v. City of Passaic, 307 A.2d 114, 117 (N.J. App. Div. 1973)). The Court is satisfied that, as a school resource officer assigned by the Salem City Police Department to Salem City High School, Officer Sieber qualifies as a "school official" who owed a duty of "reasonable supervisory care for the safety" of Plaintiff and other students. The question arises whether that encompasses a duty "to prevent incidents of child abuse and/or neglect" and "to prevent maltreatment, abuse or neglect," as the Second Amended Complaint avers. (Count 5 ¶ 2.)

In determining whether a duty of care exists, "the court must first consider the foreseeability of harm to a potential plaintiff . . . and then analyze whether accepted fairness and policy considerations support the imposition of a duty." Id. at 1284. This requires courts to consider "the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." Id. (citing Carvalho v. Toll Bros. and Developers, 675 A.2d 209, 212 (N.J. 1996)).

First, "with respect to the relationship between the parties, parents entrust their children to the care of schools, and educators have no greater obligation than to protect the

children in their charge from foreseeable dangers, whether those dangers arise from the careless acts or intentional transgressions of others." Id. (citing L.W. ex rel. L.G. v. Toms River Regional Schools Bd. of Educ., 915 A.2d 535, 550 (N.J. 2007)). Schools have a responsibility "to ensure the safety of the children in [their] charge" because schools assume a "caretaker" role over their students and "the power to act as guardians of those young wards" during the school day. Id. (citing Frugis v. Bracigliano, 827 A.2d 1040, 1050 (N.J. 2003).

With respect to the nature of the attendant risk and public interest, New Jersey prioritizes the safety and well-being of its children: the legislature has mandated an exhaustive system designed to investigate and remedy dangers to child welfare. In addition to the duty of "any person having reasonable cause to believe that a child has been subjected to child abuse" to report suspected abuse to CP&P, N.J.S.A. 9:6-8.10, schools are specifically required to investigate and report instances of suspected child abuse or neglect, N.J.S.A. 18A:36-25 & 25.2. Accordingly, the Court finds that a duty to protect against child abuse is part of a school official's duty to provide "reasonable supervisory care for the safety of students."

Whether Defendant Sieber breached that duty while he was in the room for Ms. Cuff's strip search is a factual question that this Court cannot now determine. In this instance, whether

30

Defendant Sieber breached his duty to provide for Plaintiff's safety during the school day may depend on whether he was aware of the physical search and failed to intervene. Whether Defendant Sieber breached his duty may also depend upon whether a jury finds that Ms. Cuff's search constitutes child abuse or neglect. See N.J.S.A. 9:6-1. Nor can the Court now decide whether Defendant Sieber acted with "an indifference to consequences" sufficient to constitute gross negligence. Accordingly, the Court will deny Defendants' motion for summary judgment as to Counts 5 and 6.

### e. Negligent Hiring and Supervision

Count 7 avers that Defendant Salem City "failed to exercise due care in the hiring and/or supervision of Defendants, Price, McCoy-Cuff and [Sieber]." (Second Am. Compl. Count 7 ¶ 2.) To succeed on a claim for negligent hiring or supervision, a plaintiff must prove (1) the employer "knew or had reason to know of the particular unfitness, incompetence or dangerous attributes of the employee and could reasonably have foreseen that such qualities created a risk of harm to other persons" and (2) the employer's negligence in hiring and supervising the employee permitted the employee's "incompetence, unfitness or dangerous characteristics" to proximately cause injury to a third party. DiCosala v. Kay, 450 A.2d 508, 516 (N.J. 1982); see also Gargano v. Wyndam Skyline Tower Resorts, 907 F. Supp. 2d

31

628, 633 (D.N.J. 2012). Here, Plaintiff has adduced no evidence
that Salem City had any knowledge, or even a reason to know,
that Defendant Sieber was incompetent, unfair, or dangerous in
his role as a school resource officer; there is no evidence that
he had previously been involved in this kind of behavior, or had
been subject to any disciplinary action before this incident.
Accordingly, Defendants are entitled to summary judgment on
Count 7.

### f. Intentional Infliction of Emotional Distress and Negligent Infliction of Emotional Distress

Counts 8 and 9 of the Second Amended Complaint allege that
Defendant Sieber acted either intentionally in an "outrageous
and extreme" manner, or negligently, in a way that foreseeably
caused "severe emotional distress to Plaintiff." (Second Am.
Compl. Count 8 ¶¶ 2-3 and Count 9 ¶¶ 2-3.)

To prevail on a claim for intentional infliction of
emotional distress, a plaintiff must prove "(1) defendants acted
intentionally or recklessly, both in doing the act and producing
the emotional distress; (2) defendants' conduct was outrageous
and extreme, so as to go beyond the bounds of all decency and be
utterly intolerable in a civilized community; (3) defendants'
actions were the proximate cause of the plaintiff's emotional
distress; and (4) the distress suffered was so severe that no
reasonable person could be expected to endure it." Kounelis v.

<u>Sherrer</u>, 529 F. Supp. 2d 503, 532 (D.N.J. 2008) (citing <u>Buckley</u>
<u>v. Trenton Sav. Fund Soc.</u>, 544 A.2d 857, 863 (N.J. 1988)).
Defendant Sieber argues that he cannot be liable for intentional
infliction of emotional distress because the record shows that
he did not act in an "extreme or outrageous" manner and he did
not intend for Ms. Cuff to perform the physical search on
Plaintiff. Plaintiff argues, again, that the allegations in her
Second Amended Complaint are to be presumed true at this stage
of the litigation and are sufficient to withstand summary
judgment.

The Court will grant Defendants' motion for summary
judgment as to Count 8 because the record does not show that
Plaintiff suffered distress to a severe enough degree to sustain
her claim. "[T]he genuineness and severity of emotional distress
can present threshold questions of law." <u>Decker v. Princeton</u>
<u>Packet, Inc.</u>, 561 A.2d 1122, 1128 (N.J. 1989). "Severe emotional
distress means a 'severe and disabling emotional or mental
condition which may be generally recognized and diagnosed by
professionals trained to do so." <u>Taylor v. Metzger</u>, 706 A.2d
685, 697 (N.J. 1998). New Jersey courts distinguish between
injuries that are "sufficiently palpable, severe, or enduring"
and "subjective reactions of ordinary persons who feel
victimized . . . namely, annoyance, embarrassment, and
irritation," <u>Decker</u>, 561 A.2d at 1128, and generally require

distress "sufficiently substantial to result in physical illness or serious psychological sequelae." <u>Lingar v. Live-In Companions, Inc.</u>, 692 A.2d 61, 67 (N.J. App. Div. 1997). Although the Court does not doubt that Plaintiff was acutely upset by the search in Mr. Price's office, her testimony that she has not received any counseling, therapy, or medical attention aside from regularly-schedule physician appointments since the incident, and that she suffers no physical symptoms on account of the incident besides lost sleep, is insufficient to sustain an intentional infliction of emotional distress claim as a matter of law.

Plaintiff's negligent infliction of emotional distress claim fares no better. Negligent infliction of emotional distress under New Jersey law requires a plaintiff to prove "(1) the death or serious physical injury or another caused by defendant's negligence; (2) a marital or intimate, familial relationship between plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress." <u>Portee v. Jaffee</u>, 417 A.2d 521, 528 (N.J. 1980). It is plain that Plaintiff cannot succeed on this claim, because she complains only of the search performed on her and her belongings, and not her witnessing of a traumatic injury to another person. Accordingly, the Court will grant Defendants' motion for summary judgment on Counts 8 and 9.

34

### g. Conspiracy

Plaintiff asserts in Count 10 a claim for "civil and criminal conspiracy" and avers that Defendants Price, Cuff, and Sieber "acted in concert to deprive Plaintiff of her constitutional rights." (Am. Compl. Count 10 ¶ 1.) Under New Jersey law, a civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages." Banco Popular North Amer. v. Gandi, 876 A.2d 253, 263 (N.J. 2005). "It is enough for liability if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them." Id. (citing Jones v. City of Chicago, 856 F.2d 985, 992 (7th Cir. 1988)).

Plaintiff has not adduced any evidence that Defendants Price, Cuff, and Sieber acted according to any particular agreement. It is undisputed that the school officials did not otherwise communicate about how the search of Plaintiff's person and belongings would unfold and that the room was silent during the course of Ms. Cuff's physical search of Plaintiff, aside from the directions Ms. Cuff gave Plaintiff. (Hayward Dep. at 105:16-25; 111:8-9; Price Dep. at 48:22-25).

35

At most, there is evidence in the record that Mr. Price told Officer Sieber and Ms. Cuff that their assistance was needed to search a female student for a potential weapon. (Price Dep. at 29:9-30:21.) Plaintiff argues that she thinks the search was conducted "in a manner that seemed preplanned," but can point to no evidence in the record supporting that assertion. Her position that hypothetically speaking she may be entitled to judgment is insufficient to withstand summary judgment. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Accordingly, the Court will grant Defendant Sieber's motion for summary judgment on Count 10.

### h. Respondeat Superior

Counts 1, 2, 6, 8, and 9 seek to hold Defendant Salem City liable on a theory of respondeat superior for Defendant Sieber's actions during the incident. The doctrine of respondeat superior "render[s] the employer liable for the torts of one of its employees only when the latter was acting within the scope of his or her employment." DiCosala v. Kay, 450 A.2d 508, 513 (N.J. 1982). Conduct is generally considered within the "scope of employment" if "it is of the kind that the servant is employed to perform; it occurs substantially within the authorized time

and space limits; and it is actuated, at least in part, by a purpose to serve the master." Id. (citing Restatement (Second) of Agency § 228 (1957)) (internal citations omitted). Despite Defendants' arguments to the contrary, Defendant Sieber's conduct during the search fits all of the New Jersey Supreme Court's criteria. As the school resource officer assigned to Salem High School, he "was there to assist the security officer, to assist the principal or vice principal," and to patrol and search the school as a police officer. (Sieber Dep. at 7:22-8:15.) Assisting the vice principal in a search of a student for a potential weapon, during school hours and on school property, was undoubtedly the type of activity he was retained by the school to perform, and in the school's interest. Of course, the City can only be liable for Officer Sieber's torts if Officer Sieber himself may be liable; accordingly, summary judgment is granted to the City as to Counts 1, 2, 8, and 9, for the reasons explained above as to Defendant Sieber. Summary judgment is denied for Counts 2 and 6 for the reasons explained above as to Defendant Sieber, and this claim may accordingly go forward against the City based on the respondeat superior claims.

**V.    CONCLUSION**

An accompanying Order will be entered.


**September 12, 2016**
Date

**s/ Jerome B. Simandle**
JEROME B. SIMANDLE
Chief U.S. District Judge